# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## CHARLESTON  DIVISION

| | | |
|---|---|---|
| Toby Cason, Jr. and Robert L. Stewart, | ) | Civil Action No.  2:11-2241-RMG-BM |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| South Carolina State Ports Authority, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiffs, both former employees of the Defendant South Carolina State Ports Authority (SPA), asserting claims for race discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq.[1]  The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on April 15, 2013. Plaintiff filed a memorandum in opposition to the Defendant's motion on May 2, 2013, following which the Defendant filed a reply memorandum on May 13, 2013.  A hearing was held on December 6, 2013, where the parties were represented by able counsel.

Defendant's motion is now before the Court for disposition.[2]

---

[1]This action originally also included several individually named natural Defendants and additional causes of action.  However, those other Defendants and causes of action were dismissed by Order of the Court filed October 9, 2012.

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C.  The Defendant has filed a motion for summary judgment .  As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



**Background and Evidence**[3]

Plaintiffs, both African Americans, were employed by the Defendant as security officers.  As of December 2009, Plaintiff Stewart had worked for the Defendant for twenty-one (21) years, while Plaintiff Cason had worked for the Defendant for fifteen (15) years.  During the course of their employment, both Plaintiffs' regularly received good employment evaluations.  See Rinaldi Deposition, p. 21; see also Plaintiffs' Exhibits 3 and 4 (Plaintiffs' 2009 Performance Evaluations); see also Defendant's Exhibits C and D [Plaintiffs' Performance, Pay and Disciplinary Histories].  Plaintiffs also received promotions during the course of their employment, with both eventually obtaining the rank of Lieutenant.  Stewart Deposition, pp. 52-54; Cason Deposition, p. 51; see also Defendant's Exhibit E.

In late 2009, a security officer employed by the Defendant named George Farrey resigned his employment.  Farrey, who is white, wrote a resignation letter harshly critical of the Defendant, and in which he alleged various improper actions by Police Chief Lorinda Rinaldi and others and described the Ports Authority Police Department as the "worst police department I have ever worked for".  See Defendant's Exhibit F.  This letter was distributed widely, including being published in the local newspaper.  Among Farrey's complaints was that Chief Rinaldi, who is white, treated black employees more favorably than white employees, and that certain people were being held back in the chain of command. .  Farrey specifically referenced Stewart and Cason as being officers worthy of promotion, while criticizing other supervisors.  Defendant's Exhibit F, p. 2.  As a result of this letter, Chief Rinaldi decided to hold a series of meetings "designed to resolve department issues".  See Defendant's Exhibit G; Plaintiffs' Exhibit 7; Stewart Deposition, p. 143.  However, while Chief Rinaldi initially wanted to have "round table" type meetings, few employees wanted to participate in that type of meeting, so she offered to instead meet one on one with any

---

[3]The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiffs, the party opposing summary judgment.  Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



interested employee. <u>Defendant's Exhibit I</u>; <u>see also</u> <u>Stewart Deposition</u>, pp. 144-145, 147; <u>Rinaldi Deposition</u>, pp. 39-40, 49-50, 69-70. A small number of employees accepted this invitation and met with Rinaldi.

Chief Rinaldi took notes during these meetings. <u>See</u> <u>Plaintiffs' Exhibit 8</u> [Handwritten interview notes]. These notes reflect various complaints and observations by the individuals interviewed, including observations and criticisms of the Plaintiffs, among others. <u>Id.</u>; <u>see also</u> <u>Seabrook Deposition</u>, pp. 16, 21, 23-24, 30, 32-33, 56-59; <u>Darling Deposition</u>, pp. 29-36, 41-42; <u>Darling Affidavit</u> (Defendant's Exhibit CC); <u>Rinaldi Deposition</u>, pp. 55, 60-61, 81, 90-91, 114-115. As a result of the information obtained through these interviews, Rinaldi consulted Jim Young, the Defendant's Human Resources Manager.[4] <u>Rinaldi Deposition</u>, pp. 119-120. Thereafter, on November 3, 2009, Rinaldi, Young and Steve Connor (Vice President of Human Resources)[5] interviewed both of the Plaintiffs, who denied any wrong doing or inappropriate conduct. <u>Connor Deposition</u>, pp. 23-24; <u>see also</u> <u>Defendant's Exhibit N</u> [Young Interview Notes]. As part of these interviews, both Plaintiffs were asked whether they had made racial comments, such as that they had told subordinates that Rinaldi and her staff discriminated against black officers. <u>See</u> <u>Plaintiffs' Exhibit 14</u> [Rinaldi Interview Notes], p. 3, ¶ 2(d); <u>Plaintiffs' Exhibit 15</u> [Rinaldi Interview Notes], p. 3, ¶ 2(d). Following these interviews, Rinaldi suspended both of the Plaintiffs, effective immediately. <u>Rinaldi Deposition</u>, p. 124.

Following Plaintiffs' suspensions, Rinaldi and Young re-interviewed the witnesses, and then re-interviewed both Plaintiffs on November 17, 2009. <u>Rinaldi Deposition</u>, pp. 53-54, 119-120, 126, 131-132; <u>Stewart Deposition</u>, p. 153; <u>Connor Deposition</u>, pp. 18-20; <u>see also</u> <u>Defendant's Exhibits O and Z</u>; <u>Plaintiffs' Exhibits 16 and 17</u>. Plaintiffs also agreed to take polygraph examinations, which were administered on November 19 and December 1, 2009. <u>Plaintiffs' Exhibits</u>

---

[4]Young is African American.

[5]Conner is white.



19 and 20; Defendant's Exhibit Q.  As part of these polygraph examinations, Cason was again asked whether he had made any comments to subordinates that Chief Rinaldi discriminates against black officers.  Plaintiffs' Exhibit 19, pp. 2, 4.  Stewart was not asked any questions concerning race. Plaintiffs' Exhibit 20.  The conclusions on the polygraph examination reports was that both Plaintiffs gave reactions indicative of deception to the relevant test questions.  Plaintiffs' Exhibit 19, p. 4, Plaintiffs' Exhibit 20, p. 4; see also Stewart Deposition, pp. 215-216; Rinaldi Deposition, p. 140.

Both Plaintiffs were then terminated on December 7, 2009.  Young Deposition, p. 68; Connor Deposition, p. 39; see Plaintiffs' Exhibits 21 and 22 [Termination Notices].  Cason was terminated for violation of the Defendant's harassment policy and other acts of insubordination, while Stewart was terminated for using offensive or abusive language on the premises, violation of the Defendant's harassment policy, and other acts of insubordination.  Plaintiffs' Exhibits 21 and 22 [Termination Notices].  Both Plaintiffs grieved their terminations, and their grievances were denied by Peer Review Panels as well as on appeal by Jim Newsome, President and CEO of the Ports Authority.  Stewart Deposition, pp. 180, 202-203; Conner Deposition, pp. 10, 25, 41, 43-45, 47-48, 50-51, 54; Newsome Deposition, pp. 5-7, 37-38; see also Defendant's Exhibits S [Copy of SPA Grievance Procedure], T [Copy of Peer Review Panels Recommendation], and V [Copies of Newsome letters upholding Plaintiffs' terminations].

After exhaustion of their administrative remedies, Plaintiffs filed this lawsuit in federal court contesting their terminations.  In their First Cause of Action, Plaintiffs allege that the Defendant's conduct constituted race discrimination in violation of Title VII, while in their Fourth Cause of Action Plaintiffs alleged that the Defendant's conduct was retaliatory in violation of Title VII.[6]  Plaintiffs seek both injunctive and/or declaratory relief, as well as monetary damages.  See generally, Second Amended Complaint.

---

[6]As previously noted, Plaintiffs' other allegations have been dismissed.



4

## Discussion

The Defendant has moved for summary judgment on both of Plaintiffs' remaining claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). If the moving party makes this showing, in order to avoid summary judgment the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

## I.

### (Disparate Treatment Claim)

Plaintiffs' race discrimination claim is for disparate treatment in violation of Title VII, based on their assertion that they were subjected to racial discrimination when they were unfairly disciplined and discharged. Plaintiffs' claim requires proof of intentional discrimination, either by direct evidence, by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or through a "mixed-motive" analysis.[7] Plaintiffs have not offered any direct evidence of race discrimination,[8] but nevertheless argue that they have established their disparate treatment race discrimination claim under both the McDonnell Douglas analysis and the mixed-

---

[7]Historically, consideration of a claim under the mixed-motive analysis was only proper in direct evidence cases, but that is no longer the case. See Hill v. Lockheed Martin, 354 F.3d 277, 284-285 (4th Cir. 2004); Mereish v. Walker, 359 F.3d 330, 339-340 (4th Cir. 2004); cf. Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) [en banc].

[8]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996); Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974)); see Williams v. General Motors Corp, 656 F.2d 120, 130 (5th Cir. 1981), cert. denied, 455 U.S. 943 (1982).



motive analysis for considering such claims.   The Defendant argues that Plaintiffs have failed to present circumstantial evidence to create a genuine issue of fact as to whether the employment actions at issue occurred because of Plaintiffs' race under either proof scheme sufficient to survive summary judgment.

**McDonnell Douglas and mixed-motive proof schemes**.  The United States Supreme Court articulated a three-part formula for analyzing  discrimination cases in McDonnell Douglas. First, Plaintiffs must establish a prima facie case of discrimination.  If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against them.  Second, if this presumption is established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions.  Third, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiffs to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiffs' race. McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991).[9]

In contrast to the McDonnell Douglas analysis, which requires a showing that the actions of the Defendant were based on Plaintiffs' race, in order to succeed under a mixed-motive analysis the Plaintiffs need only demonstrate that their race was a motivating factor for any employment decision, even though other factors may have also motivated the decision, although if the Defendant can demonstrate that it would have taken the same action in the absence of the impermissible motivating factor, Plaintiffs' damages are restricted to injunctive and declaratory relief, and attorneys fees and costs. Diamond v. Colonial Life and Accident Insurance Co., 416 F.3d 310,

---

[9]Despite these shifting burdens of production, however, Plaintiffs retain the ultimate burden of persuasion on the issue of discrimination throughout.  Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).



317 (4th Cir 2005). Under either analysis, however, Plaintiffs are required to submit evidence to demonstrate that the Defendant's adverse employment decision was motivated by their race. Id., at 318.

**McDonnell Douglas analysis**. In order to meet the first prong of the McDonnell Douglas formula and establish a prima facie case of race discrimination, Plaintiffs must show (1) that they are members of a protected class; (2) that they were performing their jobs satisfactorily; (3) that they were subjected to an adverse employment action; and (4) that they were replaced by someone from outside of their protected class, or there is some other evidence giving rise to an inference of unlawful discrimination. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995). See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119 (N.D.W.Va. 1996). It is undisputed that Plaintiffs are members of a protected class [African American], and were subjected to an adverse employment action when they were discharged. However, Defendant argues that the evidence does not show that Plaintiffs were satisfactorily performing their jobs, or that they were subjected to any adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

With respect to whether the Plaintiffs were satisfactorily performing their jobs, Defendant contends that the evidence shows that Plaintiffs abused their authority and engaged in highly inappropriate and unprofessional conduct, including putting the Defendant at risk of liability for sexual harassment claims, thereby justifying their dismissals. However, under the facts of this case, the question of whether or not Plaintiffs were adequately performing their jobs (at least for purposes of establishing a prima facie case) relates to Plaintiffs' job performance up to the time of the investigations that led to their dismissals, not to whether the dismissals themselves (based on decisions and findings made at that time) were justified. Cf. Obico v. Mission Creek Sr. Community, No. 11-3932, 2013 WL 622937 at * 5 (N.D.Cal. Feb. 15, 2013)[Finding that sufficient evidence existed that, up until the time of incident (which resulted the in Plaintiff's termination), Plaintiff



7

performed his job satisfactorily]; <u>Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.</u>, 921 F.Supp.2d 470, 485 (D.Md. 2013)[Finding that Plaintiff was adequately performing her job for purposes of her prima facie case where she had consistently received strong performance evaluations up until the events culminating in her termination.]; <u>see Ennis v. National Ass'n of Business and Educational Radio, Inc.</u>, 53 F.3d 55, 58 (4th Cir. 1995)[The exact standard to be used in establishing a <u>prima facie</u> case is flexible depending on the factual situation and the claim alleged]. Defendant does not dispute that up to the time of their dismissals, although Plaintiffs may have had some specific performance issues, that during the course of their many years of employment both Plaintiffs had generally received good performance evaluations and salary increases as well as promotions. <u>See Defendant's Exhibits C, D and E</u>; <u>see also Defendant's Brief</u>, pp. 2-3; <u>see also Plaintiffs' Exhibits 3 and 4</u>; <u>Rinaldi Deposition</u>, p. 21. Therefore, at least for purposes of their <u>McDonnell Douglas</u> prima facie case, the evidence before the Court is sufficient to show that both Plaintiffs were satisfactorily performing their jobs up to the time of the events which culminated in their dismissals. <u>Cf</u>. <u>Chytka v. Wright Tree Service, Inc.</u>, 925 F.Supp.2d 1147, 1167 (D.Colo. 2013)[Finding that Plaintiff was adequately performing her job for purposes of her prima facie case where, prior to her discharge, she had never received any notice of poor performance or was otherwise not performing in a satisfactorily manner.]; <u>Curry v. Pulliam</u>, 234 F.Supp.2d 921, 931 (S.D.Ind. 2002)[Where court proceeded to discussion beyond prima facie case when evidence of Plaintiff not performing his job satisfactorily (because of alleged harassment of co-worker) was also same essential issue that would be considered at the pretext level]; <u>see also Boyd v. Presbyterian Hosp.</u>, 160 F.Supp.2d 522, 535 (S.D.N.Y. 2001)["The second prong of a prima facie case, satisfactory job performance, is a fairly low threshold to meet.").

However, to establish their prima facie case, Plaintiffs still need to show that they were terminated under circumstances giving rise to an inference of unlawful race discrimination. Plaintiffs have failed to present evidence to establish this prong of their prima facie case. First, there is no evidence that, following their discharges, either Plaintiff was replaced by someone from outside of



their protected class.  See Brown v. McLean, 159 F.3d 898, 905 (4th Cir. 1998)["In order to make out a prima facie case of discriminatory termination, a Plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class"].[10]  Further, the Defendant points out (and Plaintiffs do not contest) that Rinaldi is the same individual who had promoted them over the years into the positions they held at the time of their terminations.  See Buhrmaster v. Overnight Transp. 61 F.3d 461, 464 (6th Cir. 1995) ["[A]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class."], cert. denied, 516 U.S. 1078 (1996).  Finally, the record contains substantial evidence of alleged misconduct by the Plaintiffs, discussed hereinbelow, which is attested to by both white *and* African American employees, and which Defendant contends both justifies their dismissals while providing no evidence of any discriminatory animus or motivation in these dismissals.

Officer Donna Darling (African American) testified that Stewart, who was her supervisor, was untruthful to her and harassed her.  Darling Deposition, pp. 29-36, 41-42.  Darling further attests that Stewart would engage in conversations of a sexual nature with his female subordinates, often initiating these conversations; that Stewart supervised "through intimidation and fear" and would could come to her residence, making her "very nervous"; that Stewart would say that Chief Rinaldi (his boss) did not know what she was doing; that on several occasions Stewart had asked to see photos of her in a negligee while brushing up against her, even offering to take his own pictures with a camera he had in his car; that Stewart would lie to her about actions he was taking, blaming these actions on other people; that Stewart would give certain officers preferential treatment with respect to scheduling and time off, and in particular "Officer Davis"; that Stewart would yell and curse at her if he was not happy with her performance; that he would warn his subordinates not to tell anyone outside of their post what was going on; and that Stewart "acted very crazy at times and it did not take much to set him off".  See Defendant's Exhibit CC.  Darling also attests that she complained

_____

[10] Indeed, counsel confirmed at the hearing that Plaintiffs were not replaced in their positions at all.



to Cason about Stewart's behavior, but that Cason refused to help her in violation of SPA policy, which Cason admitted in his deposition.  See Cason Deposition, pp. 38-42; see also Defendant's Exhibit L [Defendant's EEO Policy].

Officer Bernard Seabrook (African American) testified that Stewart would curse at his subordinates, on one occasion causing another officer (Officer Singleton) to start crying; that Cason would engage in conversations of a sexual nature with female employees; and that Cason and Stewart would criticize decisions made by their superiors.  Seabrook Deposition, pp. 22, 24, 32-33.

Officer Daniel Roberson (white) attests that Stewart yelled and cursed at him; that he had witnessed Stewart yelling at members of the general public; that Stewart would participate in graphic sexual conversations with some of the females on duty; that Stewart would show favoritism to Officer Davis and that people believed Stewart and Davis were having an affair; and that Stewart had told him that he [Stewart] was shielding him from disciplinary action that Rinaldi wanted him to take, which turned out to be untrue.  See Defendant's Exhibit Z.

Officer Phillip Shular (white) attests that Stewart would yell and curse at employees; that he observed an incident where Officer Davis was kicking on the restroom door yelling at Stewart to come out; and that Davis and Stewart spent a lot of time together.  See Defendant's Exhibit AA.

Officer Daphne Fullilove (white) attests that she had been yelled and cursed at by Stewart; that on several occasions Stewart would instruct her to do things that she knew were against procedure such as allowing people to enter the terminal without proper credentials; that discussions of a sexual nature would occur between Stewart and his "Dream Team" [which she described as "anybody that was black"], and generally consisting of Stewart, Cason, "along with several of the female and male officers"; that Stewart and Officer Davis would spend an inordinate amount of time together; and that Stewart and Cason would criticize Rinaldi's running of the PSO program[11] and said that Rinaldi was using this program to get rid of certified officers.  See Defendant's Exhibit BB.

---

[11]The parties represent that the PSO program was a program designed to utilize non-certified personnel to perform certain functions that did not require use of firearms or arrest power.



Officer Jacqetta Smalls (African American) attests that conversations of a sexual nature would occur in mixed company, and that Stewart and Cason would discuss their exploits with women and talk about various sex acts and things they had seen, with some of Stewart's sexual conversation and jokes giving the impression that he was speaking about Officer Davis. Smalls further attests that Stewart would yell and curse at subordinates; claim that Rinaldi had called him and cursed him out because of things his subordinates were doing; that Stewart would retaliate against subordinates who "went against him"; that Stewart and Davis appeared to spend an inordinate amount of time together; that Stewart and Cason instructed subordinates to call them on their cell phones and not on the radio if anything had occurred at the terminal, and that only after they would "walk the officer through what to say and do", could the officer then broadcast over the radio. When asked why she had never discussed any of these issues with Rinaldi, Smalls stated that Stewart had told them that Rinaldi did not care about them or want to speak to them. Smalls attests that both Stewart and Cason made these types of comments on several occasions. Smalls also attests that Stewart and Cason would tell their subordinates that Rinaldi was "placing them in harms way" through her administration of the PSO program and that Rinaldi was using the PSO program to "push out the certified officers and replace them with PSOs". Smalls attests that on one occasion she had written some tickets, and that when Stewart found out he "threw out all of the tickets she had written", and then as punishment placed her on the container gate and made her work weekends for doing something he had not told her to do. Smalls also stated that on Saturdays the officers at the Union Pier Gate would play pornographic DVDs and play music, causing her and Officer Fullilove to ask to be moved to another gate. Smalls states that Stewart and Cason, along with Officers Bell, Dibble, Jackson, and Davis[12] "would have something going on at the Union Pier gate on the weekends . . . like a party at the gate". See Defendant's Exhibit DD.

Officer Billy Byers (white) attests that he would see Stewart and Officer Davis come

---

[12]All four of these individuals are also African-Americans. Court Docket No. 116 [Court Only - Email from counsel].



through the back gate on several occasions, "normally in the morning," and that they would also leave through the back gate and return approximately one and a half hours later. Byers attests that Stewart and Davis would spend a lot of time together when they should have been out on patrol or performing other tasks, and that there were rumors that Stewart and Davis were having an affair. Byers also attests that he was yelled and cursed at by Stewart. See Defendant's Exhibit EE.

Officer Charles Sparks (white) testified that Stewart would yell and give an "ass-chewing" to his subordinates. See Defendant's Exhibit FF.

These statements by employees of the Defendant (both black and white) which are extremely critical of Stewart and Cason, and in particular the complaints verified by different employees of conduct by the Plaintiffs that could be viewed as sexually discriminatory and/or indicative of a sexually hostile work environment, provide substantial evidence to support the decision to terminate Plaintiffs' employment. Indeed, as was noted by the undersigned to counsel at the hearing, for the Defendant not to have taken action based on these comments would have placed Defendant in the position of potentially being sued by one or more female employees for failing to take appropriate action upon learning of Plaintiffs' conduct. Cf. Scott v. Healthnet Federal Services, LLC, No. 11-1947, 2012 WL 340216 at * 2 (4th Cir. Feb. 3, 2012)[Noting that employer may be liable under a Title VII hostile work environment claim where it was aware of abusive atmosphere and took no action to correct or prevent it]; see Cannata v. Wyndham Worldwide Corp., No. 10-68, 2011 WL 2923888 at * 3 (D.Nev. July 18, 2011)[Where plaintiff sued defendant for its failure to follow through on discrimination investigation and for not appropriately disciplining harrasser]; Hairston v. Geren, No. 08-382, 2009 WL 2207181 (S.D.Tex. July 21, 2009)[plaintiff sued defendant where defendant allegedly failed to take appropriate action to remedy harassment].

Plaintiffs argue that notwithstanding the evidence cited hereinabove, an inference of race discrimination in their dismissals can be inferred by their being asked during the investigation process about whether they had ever told subordinates that Chief Rinaldi and her staff discriminated against black officers. See Plaintiffs' Exhibits 14, p. 3, ¶ 2(c); Plaintiff's Exhibit 15, p. 3, ¶ 2(d).



However, merely asking this question as part of the investigation in to the Plaintiffs' conduct is not a discriminatory act on the part of the Defendant, and is not evidence of race discrimination. [13]  An employer does not engage in race discrimination by, after being informed that one or more employees believed race based conduct was occurring, conducting an inquiry into those allegations to try to determine the facts.  Otherwise, an employer would not be able to investigate claims or allegations of race based conduct or discrimination in the workplace, because that investigation would then itself be race discrimination.  Such a Kafkaesque interpretation of the federal discrimination statues cannot be countenanced.

Plaintiffs also complain that the witnesses interviewed by the Defendant as a part of the investigation process were biased and had their own axes to grind, and that the investigation process itself was flawed and proper procedures not followed.  Plaintiffs further note that they were the recipient of favorable comments, and that one or more witnesses may have even believed that the investigation process was not fair to the Plaintiffs.  See Plaintiffs' Exhibit 16 and 17; see also Bell-Reed Deposition, p. 37.  Finally, Plaintiffs argue that other employees who were also identified as being engaged in some type of misconduct were not fired.  See Plaintiffs' Exhibit 8, pp. 7-8; Plaintiffs' Exhibit 38 (Thomas Deposition, p. 22-23); Rinaldi Deposition, pp. 90, 137, 177-179, 181; Cishek Deposition, p. 45; Plaintiffs' Exhibits 17, 27, 29 32, 41; Seabrook Deposition, p. 58-59, 63; Cason Deposition, p. 170; see also Court Docket Nos. 106-10, 106-16, and 106-17.  However, even if the Court were to find merit in some of these arguments, that is not evidence of race discrimination.  Plaintiffs complain in particular about Officer Darling.  Darling is herself an African-American.  Hence, any argument about Darling receiving more favorable treatment or being accorded greater credibility, true or not, is not evidence that the Plaintiffs were discriminated against because of their race.  Sargent v. Paul, 16 F.3d 946, 948 n. 4 (8th Cir. 1994)[Noting that where retained worker was a member of the same protected class as the Plaintiff, her retention was not evidence of

---

[13]However, depending on what actions the Defendant took based on this inquiry, it may be a pertinent issue relating to Plaintiffs' retaliation claim.  See discussion, Section II, infra.



discrimination by the Defendant].  Further, the other employees identified by the Plaintiffs who (Plaintiffs allege) engaged in misconduct and were not terminated are both white *and* black, so again that would not be evidence of race discrimination.  Martin v. Auburn University Montgomery, 908 F.Supp.2d 1259, 1271 (M.D.Ala. 2012)[Where the court found that plaintiff's evidence regarding the treatment of a member of his same protected class undermined his attempt to show prejudice]; see also Henny v. New York State, 842 F.Supp. 530, 554 n. 22 (S.D.N.Y. 2012) [Appointment of member of same race "certainly weakens any inference that can be drawn from the facts presented here that Plaintiff's supervisors were motivated by discriminatory animus against African-Americans in their treatment of Plaintiff."].  Additionally, Plaintiffs themselves had previously had some employment problems or disciplinary actions during the course of their employment and were not fired.  Cishek Deposition, pp. 20, 23-24; Cason Deposition Exhibits 22 & 23; see Court Docket Nos. 103-4, 103-5, 106-24, pp. 3-6.

The question is also not whether the Defendant made the right decision in terminating Plaintiffs' employment, or whether the process used by the Defendant was fair.  The only issue before the Court is whether there is any evidence to show that they were terminated *because they are black*. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md. 1995) ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"], citing Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1977); Curry, 234 F.Supp.2d at 933.  Plaintiffs have presented no such evidence.  Rather, the evidence shows that the Plaintiffs  worked for Chief Rinaldi for many years, during which time Rinaldi had given both of them good employee reviews and even promoted them.  There is no evidence in the record of any racial animus on the part of Rinaldi against Plaintiffs or any other African-Americans.  Indeed, Farrey's assertion in his resignation letter was that Rinaldi treated blacks *more favorably* than she did whites - that was one of his complaints.  Additionally, the evidence before the Court, and on which the Defendant's terminations were based, contains allegations of misconduct against the Plaintiffs from both white *and* black employees.  Ross, 759 F.2d at 366 ["Title VII serves the laudable goal of protecting



14

employee access to agencies and courts.  It does not shield employees from normal sanctions for misconduct"].  Nor is there evidence that white employees had engaged in similar conduct and were not terminated.[14]

In order to proceed on this claim, Plaintiffs must present evidence sufficient to give rise to a genuine issue of fact that their terminations were based on race discrimination, not because the Defendant made a mistake (assuming the evidence showed any such mistake), treated them unfairly, or was simply incorrect in its findings or decisions concerning Plaintiffs' employment.  Cf. Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 680 (7th Cir. 1997) ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination.  Thus when an employee is discharged because of  an employer's honest mistake, federal anti-discrimination laws offer no protection."]; Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); Colbert v. Tapella, 677 F.Supp. 289, 295 (D.D.C. 2010)(quoting Hairsine v. James, 517 F.Supp.2d 301, 308-309 (D.D.C. 2007)["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions . . . . A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects discriminatory decisions, not wrong ones."].  Plaintiffs have failed to do so.  Therefore, Plaintiffs have failed to establish the fourth prong of their McDonnell Douglas prima facie case.

**Mixed-motive analysis**.  Nor have Plaintiffs established any basis for relief under a mixed-motive analysis, as in order to do so, Plaintiffs must demonstrate that their race was a

---

[14]As an example of purported unequal treatment, Plaintiffs point to an incident from 2004 where Lt. Olin Davis (identified at the hearing as being Asian, and not the same person as Officer Davis, who is black), then a sergeant, was reprimanded for cursing while on duty.  See Plaintiffs' Exhibit 1; see also, Rinaldi Deposition, pp. 177-179.  That incident is not similar in either scope or severity to the kind of conduct involved here.  Cf. Stone v. Parish of East Baton Rouge, 329 Fed.Appx. 542 at **3-4 (5th Cir. 2009)[Finding conduct of comparators was not similar]; Lucas v. Chicago Transit Authority, 367 F.3d 714, 733 (7th Cir. 2004); Frazier v. Dep't of Labor, No. 01-198, 2003 WL 21254424 at *2 (S.D.Ind. Mar. 4, 2003).



motivating factor in the decision to terminate their employment, even though other factors may also have motivated the decision. <u>Diamond</u>, 416 F.3d at 317. For the reasons set forth hereinabove, Plaintiffs have failed to provide any such evidence.

There is no evidence that Chief Rinaldi had ever made any racial statements, used any racially derogatory language, or ever discriminated against African-Americans in any of her employment decisions. Indeed, the investigation at issue was launched, in part, due to claims that Renaldi showed *favoritism* to African-Americans. With respect to these two Plaintiffs in particular, the evidence shows that Chief Rinaldi had given them positive employee evaluations and had promoted them over the years into the positions they held at the time of their terminations. However, when an investigation into the working conditions in the police department was begun after Farrey's resignation letter was disseminated, the Defendant received numerous negative employment reports regarding both Plaintiffs from both white and black employees, including specifically allegations of sexually discriminatory, abusive, or hostile actions on their part, following which both Plaintiffs were terminated. <u>Ross</u>, 759 F.2d at 366 ["Title VII serves the laudable goal of protecting employee access to agencies and courts. It does not shield employees from normal sanctions for misconduct"]

Whether this was the right decision for the Defendant to make under the circumstances is not for this Court to determine, as the only issue before this Court is whether there is any evidence that the decision was made, even in part, due to race discrimination. <u>See</u> <u>Hawkins v. Pepsico, Inc.</u>, 203 F.3d 274, 281 (4th Cir. 2000)[affirming the grant of summary judgment to the employer where the employee did not "show that...[the] problems were racial in nature"]; <u>Diamond</u>, 416 F.3d at 317 [Plaintiffs must demonstrate that race was a motivating factor in employment decision]. Plaintiffs have submitted no such evidence, and therefore their race discrimination disparate treatment claim fails even under the mixed-motive analysis. <u>Rucker v. Greenville Co. Sheriff Dep't.</u>, No. 10-1533, 2012 WL 951789, * 2 (D.S.C. March 20, 2012)[Conclusory allegations or denials, without more, are insufficient to preclude the granting of a summary judgment motion]. The Defendant is entitled to summary judgment on this claim. <u>Boden v. U.S. Amada Ltd.</u>, 978 F.Supp. 657, 659 (E.D.N.C. 1997)



[former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination]; <u>Gairola v. Virginia Dep't of General Services</u>, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985)[a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."]; <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)[A party opposing summary judgment "cannot create a general issue of fact through mere speculation or by the building of one inference upon another."].

## II.

### (Retaliation Claim)

In their Fourth Cause of Action, Plaintiffs assert that the Defendant retaliated against them for opposing discriminatory practices by discharging them in violation of Title VII. Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a)[setting forth the standard for a retaliation claim], provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicants for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Retaliation cases under Title VII are subject to the same requirements of proof as are applicable to disparate treatment claims. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985) <u>overruled on other grounds</u>, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989); <u>see also</u> <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 457 (4th Cir. 1989). The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the

17



protected activity and the adverse action. <u>Id.</u>; <u>Munday v. Waste Management of North America, Inc.</u>, 126 F.3d 239, 242 (4th Cir. 1997). Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate that the Defendant's proffered reason is pretextural. <u>Id</u>

Turning first to the elements of the prima facie case, it is undisputed that the Defendant took adverse action against the Plaintiffs when they were terminated. However, Defendant contends that Plaintiffs did not engage in protected activity, nor is there any evidence of a causal connection between any protected activity and their dismissals.

With respect to Defendant's first contention, the argument posed is that one or both of the Plaintiffs telling other employees that Rinaldi and her staff discriminated against blacks is not protected activity. However, if the Defendant believed the Plaintiffs were complaining about, opposing, or telling other employees, that Rinaldi and her staff discriminated against African-Americans and that they should take action as a result,[15] such activity could be considered protected

---

[15]Both Plaintiffs deny that they ever made any such comments. <u>See</u> <u>Stewart Deposition</u>, pp. 161, 210; <u>Plaintiffs' Exhibit 14</u>, p. 3(c); <u>Plaintiffs' Exhibit 15</u>, pp. 3(d), 5(d)(4)(d). Therefore, the question of protected activity turns on what the Defendant believed had occurred at the time. <u>Johnson v. Napolitano</u>, 686 F.Supp.2d 32, 34-37 (D.D.C. 2010) (citing <u>Fogelman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 571-572 (3d Cir. 2002)). Although is it unclear whether the Fourth Circuit has yet addressed the viability of this "perception" theory, the undersigned finds the Third Circuit's rationale for accepting this theory of relief to be persuasive. <u>Folgelman</u>, 283 F.3d at 571 [The retaliation statute "focus[es] on the employer's subjective reasons for taking adverse action against an employee [ ]. [Thus,] it matters not whether the reasons behind the employer's discriminatory animus are actually correct as a factual matter"]. <u>See also</u> <u>Grosso v. City Univ.</u>, No. 03-2619, 2005 WL 627644 at * 2 (S.D.N.Y. Mar. 14, 2005)["[W]e find that the language of 42 U.S.C. § 2000e-3(a) is consistent with the 'perception theory' of retaliatory discrimination."]; <u>U.S.E.E.O.C. v. Bojangles Restaurants, Inc.</u>, 284 F.Supp.2d 320, 329 (M.D.N.C. 2003)[Discussing the retaliation clause, "the word 'assisted' means providing voluntary or involuntary support in any manner to a person the employer believes to have engaged, or fears will be engaging, in protected activity. The assistance may, but need not, be actual assistance so long as it is proven that the employer perceives that assistance was or will be given . . . ."]; <u>Puidokas v. Rite-Aid of Pennsylvania</u>, No. 09-2147, 2010 WL 1903590 at * 3 (M.D.Pa. May 10, 2010) [Denying Defendant's motion to dismiss Plaintiff's "perception theory" retaliation claim]; <u>Daughtry v. Family Dollar Stores, Inc.</u>, No 09-5111, 2011 WL 601270 at * 6 (D.N.J. Feb. 16, 2011[Plaintiff's perception theory retaliation claim failed where Plaintiff did not present any evidence that Defendant had any knowledge of protected activity]; <u>but see</u> <u>McKinney v. Bolivar Medical Center</u>, 341 Fed.Appx. 80, 83 (5th Cir. 2009)[Noting that the Fifth



activity for purposes of a Title VII retaliation claim. See Johnson, 686 F.Supp. 2d at 34-37; Fogelman, 283 F.3d at 571-572; n. 15, supra. The evidence before the Court is sufficient to establish a question of fact that the Defendant at least believed this conduct had occurred; see Plaintiffs' Exhibit 19, p. 4; and the undersigned cannot find as a matter of law that such conduct does not constitute protected activity. Cf. Diaz v. Miami Dade County, No. 09-21856, 2010 WL 3927751, at * 5 (S.D.FL. Aug. 17, 2010)[Noting that protected activity includes resisting or confronting an unlawful employment practice]. The question therefore becomes whether a causal connection exists between the Defendant's belief or perception that Plaintiffs were telling their subordinates that Chief Rinaldi and her staff discriminated against blacks, and the Defendant's decision to terminate their employment.

The lessened causation test applicable to mixed-motive cases does not apply to Title VII retaliation claims. Therefore, to establish the causation prong of their retaliation prima facie case, Plaintiffs' evidence must be sufficient (for purposes of summary judgment) to give rise to a genuine issue of fact as to whether "but for" the Plaintiffs' having allegedly told their subordinates that Chief Rinaldi and her staff discriminated against blacks, they would not have been subjected to the disciplinary action of termination. University of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 2533-2534 (2013)["a plaintiff making a [Title VII] retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"]. Here, the Defendant makes a strong argument that the Plaintiffs' alleged misconduct as set forth in the sworn witness statements and deposition testimony provided to the Court establishes that the Plaintiffs would have been terminated even had the Defendant not, as part of its investigation, inquired into the issue of whether Plaintiffs were telling their subordinates that Rinaldi and her staff discriminated against blacks. See also, Discussion from Section I, supra. However, it is also the case

---

Circuit has not adopted the perception theory of retaliation]. Accordingly, if Plaintiffs can show that the Defendant took an adverse action against them because it thought they were engaging in protected activity, it does not matter whether the Defendant's perception was factually correct.



that the *only time* this issue is reflected in the evidence is when Darling allegedly said during her interview that Stewart had complained that Rinaldi treated blacks and whites differently and that therefore the black employees needed to "stick together."  See Defendant's Exhibit [Court Docket No. 114-1, p. 6].  No other witnesses raised this issue or made this claim, nor is this issue ever raised or discussed at any other time in the witness interviews.

            Considered in the light most favorable to the Plaintiff, the fact that the Defendant chose to raise this issue in its interviews with both of the Plaintiffs when it was not a point of contention with the witnesses interviewed, and is not even an issue addressed in any of the sworn witness statements or deposition testimony provided by the Defendant to the Court,[16] can give rise to an inference that certainly the Defendant believed this issue to be more important than any of the witnesses themselves.  Indeed, a question relating to this specific matter was one of only three control questions asked of Cason during his polygraph examination, even though there is no evidence that Cason had ever made such a statement or had even discussed this issue. .  See Plaintiffs' Exhibit 19, p. 4.  This emphasis placed by the Defendant itself on an issue that their own witnesses apparently did not include among the various transgressions and criticisms leveled at the Plaintiffs is sufficient to create an issue of fact as to whether there is a connection between the Defendant's belief that the Plaintiffs had engaged in such racially provocative conversations or discussions with other employees and Plaintiffs' terminations to satisfy the third prong of their prima facie case.  Texas Dep't of Community Affairs, 450 U.S. at 253 [the burden of establishing a prima facie case is not onerous].

            Further, while the Defendant has certainly set forth a legitimate, non-discriminatory reason for the employment action it took, for the same reasons just discussed the undersigned finds that sufficient evidence of pretext has been shown to avoid summary judgment.  Considered in the light most favorable to the Plaintiffs, the evidence could be construed to show that after allegations

---

[16]Darling's purported comment referenced hereinabove is only found in Rinaldi's handwritten interview notes.  It is not present in Darling's typed sworn statement.  See Defendant's Exhibit CC.  Further, Darling's purported statement only identifies Stewart as having made this comment.  She does not mention Cason.



were made of racial favoritism and other employment problems in the Defendant's police department, an investigation was launched during which several employees complained about how the Plaintiffs performed their jobs.  Some of these complaints addressed lesser matters for which employees had been possibly disciplined in the past, but not terminated, while others (in particular relating to Plaintiffs' conduct around female employees) were more serious.  However, none of these employees/witnesses complained or made an issue about either Plaintiff discussing or warning about Chief Rinaldi and her staff discriminating against blacks, other than apparently the one comment by Darling (but only reflected in Rinaldi's interview notes, not in Darling's sworn statement itself) that Stewart had said whites and blacks were being treated differently and that the blacks therefore needed to "stick together".  Nonetheless, this issue was then pursued by the Defendant as one of the topics of discussion during its interviews of both Plaintiffs, and was then raised again as one of only three control questions addressed to Cason (but not Stewart) during his polygraph examination.  This emphasis showing the concern and importance that the Defendant placed on this issue is sufficient to present an inference that this alleged conduct by the Plaintiffs, and the Defendant's possible animus against Plaintiffs for having engaged in such conduct, was one of the factors at play in its decision making process.  See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) [Retaliation claim presented where Plaintiff has "evidence from which a reasonable fact finder could conclude that a causal connection exists between the protected activity and the adverse action(s)].  LeBlanc v. Great American Insurance Co., 67 F.3d 836, 843 (1st Cir. 1993)["Discriminatory intent may be inferred from the totality of the circumstances, including . . . the historical background of the decision . . . ; [t]he specific sequence of events leading up to the challenged decision . . . ; [and] contemporary [actions] by member of the decision making body . . ."] (internal quotations omitted].

        Whether this alleged conduct (which could be deemed by a finder of fact to be protected conduct) was the tipping point that swayed the Defendant to terminate Plaintiffs' employment (i.e., the "but for" criterion) instead of imposing some lesser punishment is an issue that

21



under the facts of this case Plaintiffs should be allowed to argue to the finder of fact.[17] Muhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) [”Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, ‘whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law’”], citing Anderson, 477 U.S. at 250-252; cf. City of Farmington-Hills Employees Retirement System v. Wells Fargo, ___ F.Supp.2d ___, 2013 WL 5230720 at *12 (D.Minn. Sept. 17, 2003)[Denying summary judgment where, “despite the unlikelihood of success at trial . . . [the party seeking summary judgment] neither demonstrated that the [opposing party’s claims] fail as a matter of law, nor the absence of any genuine issue of material fact sufficient to warrant summary judgment.”]; Iannillo v. County of Orange, 187 F.Supp.2d 170, 185 (S.D.N.Y. 2002)[“We express no views as to plaintiff’s chances of success [on the merits of his claim] at trial, and decide only that there is a material issue of fact as to causation that renders summary judgment inappropriate at this time.”]; Austen v. Catterton Partners V, LP, 709 F.Supp.2d 172 (D.Conn. 2010). [“[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely”] [Rule 12 Motion to Dismiss]. Therefore, summary judgment should not be granted on this claim. See LeBlanc, 67 F.3d at 843 [“Direct or indirect evidence of discriminatory motive may do, [as long as] ‘the evidence as a whole...[is] sufficient for a reasonable fact-finder to infer that the employer’s decision was motivated by [retaliatory animus]’”].

---

[17] For example, Smalls attested in her statement that, in addition to the Plaintiffs, Officers Bell, Dibble, Jackson and Davis engaged in improper conduct at the Union Pier gate on the weekends. See Defendant’s Exhibit DD. Plaintiffs were both terminated, but these other employees were not. Since all of these other individuals were also African-Americans, that fact does not create an inference of race discrimination. See discussion, Section I, supra. However, Plaintiffs could argue at trial that, based on the evidence, the difference in how they were treated was because the Defendant perceived that the Plaintiffs had been telling black employees that Rinaldi discriminated against blacks, and that that constituted unlawful retaliation.



**Conclusion**

Based on the foregoing, is recommended that the Defendant's motion for summary judgment with respect to Plaintiffs' disparate treatment race discrimination claim be **granted**, and that that claim be **dismissed**. For the reasons stated, it is further recommended that Defendant's motion for summary judgment with respect to Plaintiffs' Title VII retaliation claim be **denied**.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

January 7, 2014
Charleston, South Carolina



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a *Defendants' Exhibit* novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

